963 So.2d 969 (2007)
DEPARTMENT OF HIGHWAY SAFETY AND MOTOR VEHICLES, etc., Appellant,
v.
Faryd A. SALEME, Appellee.
No. 3D06-1033.
District Court of Appeal of Florida, Third District.
September 12, 2007.
*970 Andrew J. Anthony and Bradley A. Silverman, The Law Offices of Anthony & Associates, P.A., Coral Gables, for appellant.
Pape & Chandler and Marc A. Chandler, Fort Lauderdale, for appellee.
Before WELLS, CORTIAS, and ROTHENBERG, JJ.

On Motion for Rehearing
ROTHENBERG, Judge.
We grant the appellee's motion for rehearing, withdraw our former opinion dated February 21, 2007, and substitute the following opinion in its stead:
Faryd A. Saleme ("Saleme") and Trooper Lozano of the Department of Highway Safety and Motor Vehicles, Division of Florida Highway Patrol ("FHP"), were involved in a motor vehicle accident on SR 826 wherein Saleme ran into the rear end of Trooper Lozano's patrol car. Saleme filed a complaint against the FHP alleging that Trooper Lozano was negligent in the operation of his patrol car. The jury ultimately found that both Trooper Lozano and Saleme were negligent and that the negligence of each was a contributing cause of the accident, assigning 85% of the fault to Saleme and 15% of the fault to Trooper Lozano, resulting in a final judgment awarding Saleme $81,250.44, which FHP now appeals. The FHP claims that the trial court erred in denying its motion for a directed verdict and its post-trial motion for judgment notwithstanding the verdict ("JNOV"). We agree and, therefore, reverse and remand with directions to the trial court to enter a final judgment in favor of the FHP.

THE EVIDENCE
Trooper Lozano had stationed his patrol car on the right hand shoulder of SR 826 facing southbound approximately 589 feet south of the crest of the Sunset Drive overpass in an attempt to catch speeding motorcyclists who were headed to Fuddrucker's in south Miami-Dade. Trooper Lozano explained that on Thursday nights, motorcyclists meet at Fuddrucker's, and that they often drive at high rates of speed and recklessly on that particular section of SR 826, which ends at U.S. 1 near Fuddrucker's. Saleme, who had ridden on this roadway approximately a thousand times and knew it well, was riding his motorcycle in a triangle formation with two companions, who were also on their motorcycles. Saleme rode in front with Rene Bermudes ("Bermudes") and another friend, ("Frank"), riding behind him. All three were speeding. Saleme testified that he was initially traveling at a speed of at least 60 to 65 mph, but admitted that he had told the accident investigator on the night of the accident that he was initially traveling between 65 and 70 mph. The speed limit on SR 826 is 55 mph.
Prior to reaching the hill, two other motorcyclists, a man on a yellow Suzuki and another individual, approached Saleme, stayed with him momentarily, and then sped off. Saleme, who was already traveling at 65 to 70 mph when he was *971 approached by the man on the yellow Suzuki, sped up to chase the Suzuki. Trooper Lozano testified that he clocked the Suzuki at well over 100 mph, but that he could not remember the exact speed it was traveling when it passed his patrol car, which was parked 589 feet from the top of the hill. Bermudes testified that the driver on the yellow Suzuki was traveling between 100 and 120 mph.
Upon seeing the speeding motorcyclists (the man on the yellow Suzuki and a second motorcyclist who was not Saleme), Trooper Lozano began to pursue them and entered the roadway from the right shoulder. Trooper Lozano testified that there had been a break in the traffic when the Suzuki passed him. Trooper Lozano put his car in gear, turned on his lights, checked to make sure no traffic was coming, and pulled out into the right hand lane, and while accelerating, crossed into the center and then into the left lane, all the while looking to his left to make sure no other traffic was coming. As Trooper Lozano was making his way onto and across SR 826, Saleme came up over the hill, saw the trooper in his lane of travel, applied his brakes, and skidded 156 feet before hitting the back of the trooper's patrol car.
Sergeant Marisela Fernandez, a traffic homicide investigator trained in civil engineering and accident reconstruction, investigated the accident, and testified that based upon her analysis, Saleme was driving between 80 and 85 mph when he first saw Trooper Lozano. It was undisputed that Trooper Lozano was traveling at approximately 50 mph and was accelerating when he was struck by Saleme. Bermudes, who was approximately three car lengths behind Saleme before Saleme accelerated to chase the man on the yellow Suzuki, testified that he was approximately a half of a football field (150 feet) behind Saleme when Saleme hit the patrol car. Neither Bermudes nor Frank was involved in the accident.
The accident occurred 789 feet south of the crest of the hill, which means Trooper Lozano traveled 200 feet upon entering onto the roadway.
Saleme testified that when he first saw Trooper Lozano, Trooper Lozano was already in the left lane, which is the same lane Saleme was traveling in. He did not see Trooper Lozano as Trooper Lozano made his way across SR 826 and he could not testify how long Trooper Lozano had been in the left lane before he hit the trooper's patrol car. He did testify, however, that upon seeing the trooper's car in his lane, he applied his brakes "hard."
Sergeant Fernandez testified that it takes two-and-a-half seconds from the time an individual perceives the danger to react to it. Sergeant Fernandez further testified that at 80 mph (Saleme was traveling 80 to 85 mph when he saw the trooper), Saleme would travel 117 feet per second. Thus, Saleme traveled at least 292 feet from the time he first saw Trooper Lozano in his lane of travel until he applied his brakes. After applying his brakes, he skidded 156 feet and then hit the patrol car. He, therefore, traveled at least 448 feet from the time he first saw the trooper in the left lane to the time when he made contact with the patrol car, a distance of one-and-a-half football fields. These facts are critical because they demonstrate that when Trooper Lozano pulled into the far left lane, the nearest motorist, which was Saleme, was at least 292 feet or nearly 100 yards, the distance of a football field, behind him. The evidence reflects that Saleme began accelerating as he traveled up the hill, and within two to three seconds after traveling over the top of the hill, saw the patrol car in his lane, tried to slow *972 down, but was going too fast to avoid hitting the trooper's car.

THE PRESUMPTION
In Florida, there is a rebuttable presumption that the negligence of the rear driver in a rear-end collision was the sole proximate cause of the accident. Clampitt v. D.J. Spencer Sales, 786 So.2d 570, 572-73 (Fla.2001). This presumption may be rebutted "[w]hen the defendant produces evidence which fairly and reasonably tends to show that the rear fact is not as presumed," that the rear-end collision was not the result of the rear driver's negligence. Gulle v. Boggs, 174 So.2d 26, 29 (Fla.1965). The courts, however, have recognized three specific fact patterns which may rebut this presumption:
(1) affirmative testimony regarding a mechanical failure, see, e.g., Gulle, 174 So.2d at 29 (holding that affirmative testimony by the defendant that his brakes failed was sufficient to overcome the negligence presumption);
(2) affirmative testimony of a sudden and unexpected stop or unexpected lane change by the car in front, see, e.g., Conda v. Plain, 222 So.2d 417, 417-18 (Fla.1969) (holding that testimony by the defendant that the plaintiff suddenly switched into the defendant's lane while the defendant was passing the plaintiff was sufficient to rebut the presumption); and
(3) when a vehicle has been illegally and, therefore, unexpectedly stopped, see, e.g., Ry. Express Agency, Inc. v. Garland, 269 So.2d 708, 710 (Fla. 1st DCA 1972) (presumption rebutted where defendant, who was driving a bus, improperly stopped on an expressway to pick up fallen debris), cert. denied, 275 So.2d 14 (Fla.1973); Ben's Seltzer, Inc. v. Markey, 254 So.2d 377, 378 (Fla. 3d DCA 1971) (presumption rebutted where plaintiff presented evidence that defendant was improperly stopped on a bridge), cert. denied, 261 So.2d 176 (Fla.1972).
See Liriano v. Gonzalez, 605 So.2d 575, 576 (Fla. 3d DCA 1992).

LEGAL ANALYSIS
The FHP asserts that the trial court erred in denying its motion for a directed verdict and its post-trial motion for a JNOV because Saleme failed to present sufficient evidence to rebut the presumption of negligence that attaches to a rear motorist in a rear-end collision. We agree as (1) there is absolutely no evidence in the record of any mechanical failure, that Trooper Lozano made a sudden stop or an unexpected lane change, or that Trooper Lozano was illegally stopped on the roadway; (2) Saleme failed to present any evidence that if there had been a sudden lane change, it occurred at a time and place where it could not reasonably have been expected; and (3) the evidence conclusively establishes that the accident occurred solely as a result of Saleme's negligence.
(1) No evidence of a sudden lane change
Saleme's theory of the case was that Trooper Lozano suddenly swerved into Saleme's lane of travel. Despite the dissent's assertion to the contrary, there was, however, no evidence presented to support this theory. Trooper Lozano testified that when he pulled onto the roadway, there had been a break in the traffic, he turned to his left to make sure that no other traffic was coming, and he continued to look to his left as he crossed into the middle and then into the left lane. Trooper Lozano testified that he was completely in the left lane and had been *973 traveling in that lane for several seconds prior to the impact. The physical evidence supports the trooper's testimony, as Saleme's motorcycle struck near the center of the rear of the patrol car.[1] Trooper Lozano was traveling within the speed limit. Trooper Lozano did not testify that he made a sudden lane change.
Saleme, who was already driving in excess of the speed limit (65 to 70 mph in a 55 mph zone), accelerated on the back side of the hill even though he admits that he had no idea whether there were other motorists on the other side of the hill, and had reached a speed of at least 80 to 85 mph as he cleared the top of the hill. Saleme testified that he never saw Trooper Lozano's vehicle as it proceeded from the right lane to the left lane, and in fact, stated that when he first saw the trooper's vehicle, it was already in his lane of travel. Thus, Saleme did not testify that Trooper Lozano made a sudden lane change, and in fact, his testimony supports Trooper Lozano's testimony that he had not made a sudden lane change and was traveling in the left lane for several seconds prior to impact. More importantly, Saleme's friend, Rene Bermudes, who actually saw the trooper's vehicle as it made its way across the roadway, did not testify that Trooper Lozano made a sudden or unexpected lane change. In fact, Bermudes could not even estimate how long Trooper Lozano had been in the left lane before being struck by Saleme, and could not estimate how far back Saleme was when the trooper crossed into the left lane.
In addition to the absence of any eyewitness testimony of a sudden lane change, there is the lack of physical evidence which could support such a finding. In fact, the physical evidence requires the converse conclusion. Saleme was traveling at 80 to 85 mph when he first saw Trooper Lozano, who was already in the left lane. According to Sergeant Fernandez's unrebutted testimony, at that speed, Saleme was traveling 117 feet per second. Because it took Saleme at least two-and-a-half seconds to react when he saw the trooper in his lane, Saleme traveled at least 292 feet, or nearly 100 yards before he was able to react and apply his brakes. After Saleme applied his brakes, he slid another 156 feet and struck the center of the rear end of Trooper Lozano's vehicle. Saleme was, therefore, at least 100 yards or the distance of a football field behind Trooper Lozano when Trooper Lozano had already crossed into Saleme's lane of travel or was crossing into Saleme's lane of travel.
Changing lanes when the nearest motorist is over 100 yards or in excess of a football field away, when the speed limit is 55 mph, cannot intelligently constitute a sudden lane change sufficient to rebut the presumption of negligence that attaches to a rear motorist in a rear-end collision, especially when the record, as here, conclusively establishes the negligence of the rear motorist. The dissent, however, claims that the presumption that the accident was not caused by Saleme's own negligence was rebutted by the following: (1) Trooper Lozano had not activated his emergency lights or siren; (2) according to Bermudes there "wasn't much" distance between Trooper Lozano's patrol car and Saleme's motorcycle when Trooper Lozano moved into Saleme's lane; and (3) "Saleme testified that he saw the side mirror on Trooper Lozano's patrol car, and Trooper Lozano looking at him as he crossed into the left lane." We cannot agree.
*974 The fact that Trooper Lozano had not activated his emergency equipment is irrelevant to the question of whether Trooper Lozano made a sudden lane change. Interestingly, Trooper Lozano explained that he did not activate his emergency equipment because in his experience, motorcyclists (such as this one going 100 to 120 mph) generally increase their speed to outrun a patrol car, thus increasing the danger to other motorists on the highway and subsequently avoid apprehension. Thus, the failure to activate his emergency equipment not only is irrelevant to whether Trooper Lozano made a sudden lane change, it demonstrates Trooper Lozano's concern for the safety of other motorists.
Regarding Bermudes' testimony, he was not able to testify as to the distance between Trooper Lozano's vehicle and Saleme's motorcycle when the trooper moved into the left lane and he never testified that Trooper Lozano made a sudden lane change. In fact, Bermudes was never asked that question by either of the attorneys. He was asked, however, and admitted, that he could not even estimate the distance between the trooper's vehicle and Saleme's motorcycle when Trooper Lozano moved into Saleme's lane of travel.
Q. In your estimation, how close to Mr. Saleme was the FHP cruiser when he entered the lane, Mr. Saleme's lane?
A. Estimate?
A. I couldn't tell you that.
Q. Okay.
A. It wasn't much. I can't remember.
Lastly, the dissent mischaracterizes Saleme's testimony. The dissent claims that "Saleme testified that he saw the side mirror on Trooper Lozano's patrol car, and Trooper Lozano looking at him as he crossed into the left lane." What Saleme testified to was that he never saw Trooper Lozano changing lanes or in any lane other than the far left lane, the lane Saleme was traveling in. When he first saw the trooper's vehicle it was already in his lane and as he came up on the trooper, he could see him looking at Saleme in his side mirror but that he (Saleme) was already too close to the trooper at that point.
Q. Did you see the person operating the car?
A. The first thing that I was able to see when he was coming in towards where I was, was the mirror. I saw something, because something was coming, and I saw him, and that he was looking at me, but I was already too close to him.
Q. What you are saying, sir, is that as the officer was going from the far right shoulder, you didn't see him then. Correct?
A. Yes.
Q. You didn't see the Florida Highway Patrol Officer when he was in the far right lane, after coming from the shoulder. True?
A. True, I didn't see him.
Q. And you didn't see him when he was in the middle lane, either did you, sir?
A. Correct. I did not see him in the center lane.
When asked when he first saw the trooper, Saleme responded that he could not "remember very well" and thus, had his memory refreshed by his deposition:
Q. Whether the first time you saw him is when you were within a few feet of him. And you responded that, his rear lights were already in my tires. And then I asked you, you never saw him before that. Right?
A. Right
*975 Thus, contrary to the dissent, it is clear from Saleme's own testimony that he did not see Trooper Lozano's vehicle as it changed lanes and did not see Trooper Lozano's vehicle in any other lane than the very same lane Saleme was traveling in.
(2) Had there been evidence of a sudden lane change, under the facts of this case, that evidence would have been insufficient to rebut the presumption that Saleme's own negligence was the sole proximate cause of the accident.
While there is no evidence of a sudden lane change and Saleme failed to rebut the presumption of negligence which attaches to the rear driver in a rear-end collision, even if Saleme had offered evidence of a sudden lane change, we conclude that a sudden lane change, under the facts of this case, would be insufficient to rebut the presumption.
Sudden lane changes can be likened to sudden stops. In Clampitt, the Florida Supreme Court clarified that a sudden or abrupt stop, standing alone, is insufficient to overcome the presumption of negligence which attaches to the rear driver in a rear-end collision. Clampitt, 786 So.2d at 575 ("It is well settled that a sudden stop, without more, is insufficient to overcome the presumption of negligence."). The Court explained that:
It is not merely an "abrupt stop" by a preceding vehicle (if it is in its proper place on the highway) that rebuts or dissipates the presumption that the negligence of the rear driver was the sole proximate cause of a rear-end collision. It is a sudden stop by the preceding driver at a time and place where it could not reasonably be expected by the following driver that creates the factual issue.
Id. at 574 (citing Pierce v. Progressive Am. Ins. Co., 582 So.2d 712, 714 (Fla. 5th DCA 1991)); see also Blake v. Singer, 914 So.2d 994, 995 (Fla. 4th DCA 2005) (reversing judgment in favor of the rear driver, finding that the trial court erred in denying the lead driver's motion for directed verdict as the evidence was insufficient to overcome the presumption of the rear driver's negligence, and explaining that a sudden stop by the front driver, in and of itself, was insufficient to overcome the presumption) (holding that "only a sudden stop at a time and place where it could not reasonably be expected by the rear driver creates a factual issue"); Cheng v. Sirichoke, 745 So.2d 1152, 1154 (Fla. 3d DCA 1999).
In the instant case, even if there had been evidence presented of a sudden lane change by Trooper Lozano, a directed verdict in favor of Trooper Lozano was required under the facts of this case, as Trooper Lozano's lane change occurred at least 100 yards (the distance of a football field) ahead of Saleme and any other driver. In this case, the suddenness of the lane change must be considered in light of the distance between the lead driver and other motorists and the speed at which they were traveling. In the instant case, Trooper Lozano was traveling at 50 mph and accelerating in a 55 mph zone with at least 100 yards distance between his vehicle and the nearest motorist behind his vehicle. Thus, the alleged sudden lane change was insufficient as a matter of law to rebut the presumption that attaches to Saleme as the rear motorist in a rear-end collision.
(3) The accident was as a result of Saleme's own negligence
In the instant case, it is undisputed that Saleme was operating his motorcycle at between 80 and 85 mph, far in excess of the 55 mph speed limit on SR 826. He *976 was very familiar with that area of the highway, having driven on it approximately a thousand times. He, therefore, knew that while ascending the incline of the Sunset Drive overpass, he would be unable to observe the motorists ahead or to gauge their speed or distance from him.
Q. As you approached the hill, you did not know what was on the other side of the hill, did you?
A. Correct.
Q. And because you did not know what was on the other side of the hill, you did not know whether there could have been any cars on the other side of the hill, going slower than you were going. Isn't that true?
A. Correct.
In addition to being blind to the traffic and conditions on the other side of the hill, it was nighttime, which further diminished Saleme's visibility and ability to react to the traffic once he cleared the hill. Despite these conditions, he chose to drive at a high rate of speed, and most likely with an inattentiveness, which resulted in his inability to safely react to the traffic ahead of him. Thus, even if Trooper Lozano had entered the left lane at the exact moment Saleme first observed him in the lane (which is unsupported by the evidence), Saleme was unable to avoid hitting the back of Trooper Lozano's vehicle, despite having 100 yards from the time he first observed Trooper Lozano in his lane of travel and an additional 156 feet, which is the distance he slid until striking the patrol car, to do so.
At the point of impact, Trooper Lozano was 789 feet from the crest of the hill and had traveled 200 feet from the right shoulder to arrive at that location. Based upon the undisputed evidence, Saleme was 100 yards behind Trooper Lozano, who was already in the left lane, when Saleme first observed him. The total distance from the crest to impact (789 feet), minus the distance of observation to impact, equals 341 feet, which is the distance Saleme traveled after clearing the crest before he even saw Trooper Lozano. Since Saleme was traveling at a distance of 117 feet per second, he had an additional 341 feet or approximately three seconds after clearing the crest to either see Trooper Lozano traveling in the left lane or crossing into the left lane, and yet, according to Saleme, himself, he saw neither. He, therefore, had an additional 341 feet and three seconds in which to observe, react, and to avoid the danger, had he been more attentive.
In contrast, his companion, Bermudes, who was not driving at Saleme's speed (Saleme had accelerated, thereby increasing the distance between Saleme and his companions from three car lengths to approximately 150 feet), actually observed Trooper Lozano crossing into the left lane and was able to safely avoid Trooper Lozano's vehicle. Saleme, therefore, unequivocally could have avoided the accident if he had not accelerated to 80 to 85 mph and had paid attention to the traffic ahead of him. His negligence was, therefore, the sole proximate cause of the accident.

THERE IS NO CONFLICT WITH ALFORD V. COOL CARGO CARRIERS, INC.

The dissent claims that the majority opinion is in direct conflict with Alford v. Cool Cargo Carriers, Inc., 936 So.2d 646 (Fla. 5th DCA 2006). This is not correct as in Alford, the plaintiff was a passenger in the lead vehicle; (2) the Fifth District Court of Appeal specifically found that based upon the particular facts of the case, the presumption did not even apply; and (3) the District Court concluded that summary judgment should not have been granted in favor of the rear driver because there was evidence that the lead driver *977 made a sudden and unexpected change into the center lane traveling 35 mph on I-75, with a posted 70 mph speed limit. Id. at 648-50. None of the factors present in Alford are present in the instant case. In the instant case, it is the rear motorist who is suing; the presumption applies; there was no evidence presented of either a sudden or an unexpected lane change; and Trooper Lozano was driving within five miles per hour of the speed limit, not forty-five miles under the speed limit, as was Alford. Thus, the dissent's reliance upon and claim of conflict, are misplaced.

CONCLUSION
The trial court erred in failing to grant the FHP's motion for a directed verdict. Saleme failed to present any evidence to support his claim that Trooper Lozano made a sudden lane change or unexpected lane change, which in the light most favorable to Saleme, occurred when Saleme, the nearest motorist, was at least 100 yards or the distance of a football field behind Trooper Lozano. Saleme could have, and should have, anticipated that a motorist may have been traveling in the left lane or proceeding into that lane on the other side of the hill, going at a speed much slower than Saleme's speed and consistent with the 55 mph speed limit, and that Saleme would have been unable to make this observation until after clearing the crest, leaving him with a minimal opportunity to safely react. Saleme, therefore, failed to present sufficient evidence to rebut the legal presumption that he, as the rear driver, was negligent and that his negligence was the sole proximate cause of the accident. We, therefore, reverse with directions to the trial court to enter judgment in favor of the FHP.
Reversed and remanded.
WELLS, Judge (concurring).
I write separately to address two points raised by the dissent. First, the dissent complains that without legal precedent, the majority opinion applies the "reasonable time and place" analysis, previously acknowledged in numerous "abrupt stop cases," to the sudden change of lane exception claimed here. As I see it, there must be such an analysis or the exception makes no sense. This exception contemplates two vehicles in close proximity and operates to dispel the presumption that the following driver is negligent for failure to avoid a collision when the near-by leading vehicle abruptly changes lanes making collision unavoidable. Thus where this exception is claimed, a "reasonable time and place" analysis must be made.
Second, the dissent accuses the majority opinion of usurping the proper role of the trial judge and jury in reaching this conclusion. Again, I disagree. As the Supreme Court explained in Eppler v. Tarmac America, Inc., 752 So.2d 592, 594 (Fla.2000):
Beginning with McNulty, [v. Cusack, 104 So.2d 785 (Fla. 2d DCA 1958) ] therefore, the law presumed that the driver of the rear vehicle was negligent unless that driver provided a substantial and reasonable explanation as to why he was not negligent, in which case the presumption would vanish and the case could go to the jury on its merits.
(Emphasis added) (citation omitted); see also Gulle v. Boggs, 174 So.2d 26, 29 (Fla. 1965) (observing "[w]hen the defendant produces evidence which fairly and reasonably tends to show that the rea[l] fact is not as presumed, then the impact of `the presumption is dissipated'"). Thus, it is the trial judge's responsibility to consider the facts to determine whether there was a substantial and reasonable explanation as to why the rear driver was not negligent, and it is only after that analysis is concluded *978 in the rear-end driver's favor that the case may proceed to the jury. It is, therefore, our responsibility to assure that the trial court did not abuse its discretion in making that initial determination.
Here, the parties argued that a presumption of negligence arose and attached to Saleme as the driver of the rear vehicle involved in this rear-end collision. The record demonstrates no reasonable explanation offered by Saleme for his actions that would dispel this presumption. See Davis v. Chips Express, Inc., 676 So.2d 984, 986 (Fla. 1st DCA 1996) (confirming that to create a jury issue, it is only necessary for the following driver to offer a substantial and reasonable explanation for his actions). The unrebutted evidence was that Saleme was traveling between 80 and 85 miles per hour trying to catch up to another motorcyclist going over 100 miles per hour when he crashed into the middle of an FHP cruiser traveling at 55 miles per hour in the same lane.[2] Other than the fact that Saleme's excessive speed created a "zone of risk" for anyone else traveling on this roadway at or near the posted 55 mile per hour speed limit (making Saleme the sole cause of this accident), calculations made from the physical evidence by an expert accident investigator and civil engineer established that Saleme's sudden lane change explanation was anything but reasonable. That expert's unchallenged testimony was that at 80 miles per hour Saleme was traveling 117 feet per second and that it takes 2Ω seconds between recognition of a hazard and brake initiation. Using this information, and calculating backward from the point at which Saleme applied his brakes (leaving a 156 foot skid mark before slamming into the cruiser), the unchallenged evidence is that Saleme was over 100 yards, or an entire football field, behind the FHP cruiser when he either saw it in or saw it come into his lane. This was more than enough space, no matter how quickly the cruiser came into the lane, to avoid a collision but for Saleme's excessive speed. There was no sudden unexpected lane change, and Saleme failed to provide a "reasonable" explanation for his actions to dispel the presumption of negligence on his part.
FHP was, therefore, entitled to a directed verdict on the issue of liability. More importantly, in reaching this conclusion we have applied the correct standard and have acted neither as trial judge nor jury, but rather have fulfilled our obligation as a reviewing court.
ROTHENBERG, J., concurs.
CORTIAS, Judge (dissenting).
In an exhausting recreation of supposed events,[3] complete with detailed mathematical calculations of timing and distances, which are impermissibly presented in the light most favorable to the defendant, the majority ignores and eviscerates the application of a rebuttable presumption. In so doing, they dispense with and supplant the proper roles of the trial judge and jury, choosing, instead, to perform their functions on appeal.
*979 The "rear-end collision rule" was endorsed by the Florida Supreme Court in Gulle v. Boggs, 174 So.2d 26, 28-29 (Fla. 1965). See Clampitt v. D.J. Spencer Sales, 786 So.2d 570, 573 (Fla.2001). The purpose of the rule is to create a rebuttable presumption which shifts the burden to the rear driver in a rear-end collision to come forward with evidence which "fairly and reasonably tends to show" that the presumption of negligence on the rear driver is misplaced. See id. (citing Gulle, 174 So.2d at 28-29). "If the rear driver produces sufficient evidence to rebut the presumption, the case is submitted to the jury without the aid of the presumption, `to reconcile the conflicts and evaluate the credibility of the witnesses and the weight of the evidence'." Alford v. Cool Cargo Carriers, Inc., 936 So.2d 646, 650 (Fla. 5th DCA 2006) (quoting Gulle, 174 So.2d at 29) (finding that if the rear driver rebuts the presumption, the presumption is "reduced to the status of a permissible inference . . . which the jury may or may not draw from the evidence before it"); see also, Clampitt, 786 So.2d at 573 (finding that when the rear driver produces evidence which fairly and reasonably tends to show that he was not negligent, the impact of the presumption is dissipated and negligence then becomes a jury question).
As the majority correctly states, Florida courts have carved out three categories of specific fact patterns that may effectively rebut the presumption of negligence that attaches to the rear driver in a rear-end collision. See, e.g., Alford, 936 So.2d at 649-50 (citing Eppler v. Tarmac Am., Inc., 752 So.2d 592 (Fla.2000)); Antokal v. Llana, 763 So.2d 1067 (Fla. 4th DCA 1999); Liriano v. Gonzalez, 605 So.2d 575 (Fla. 3d DCA 1992). The first category is when the lead driver makes an abrupt or arbitrary stop in a place where it could not be reasonably expected, or an unexpected lane change. Alford, 936 So.2d at 649-50; Eppler, 752 So.2d at 595-96. The second category is when a mechanical failure occurs causing the rear driver to collide with the lead driver. Alford, 936 So.2d at 649-50; Antokal, 763 So.2d at 1069 (citing Tozier v. Jarvis, 469 So.2d 884, 886 (Fla. 4th DCA 1985)). Lastly, the presumption is effectively rebutted when there is evidence that the lead vehicle was illegally and, therefore, unexpectedly stopped. Alford, 936 So.2d at 649-50; Tozier, 469 So.2d at 887. In these cases, the rationale behind the presumption of negligence is not given its intended effect because the driver of the lead vehicle was also a contributing factor of the collision.[4]Alford, 936 So.2d at 650.
Here, Saleme's theory of the case rested solely on the category addressing the presumption of negligence when the lead driver makes an unexpected lane change. However, the majority posits that in order to effectively rebut the presumption of negligence, the unexpected lane change, like the abrupt stop, must also occur at a time and place where it could not reasonably be expected by the rear driver. See Clampitt, 786 So.2d at 574 (finding that an abrupt stop by a preceding vehicle that is in its proper place on the highway is insufficient to rebut the presumption); Wright v. Ring Power Corp., 834 So.2d 329, 331 (Fla. 5th DCA 2003) (finding that it was reasonable to expect the lead driver's vehicle to abruptly stop when attempting to turn left at an intersection regulated by a stop sign); cf. Eppler, 752 So.2d at 595 *980 (finding that it was unreasonable for the lead driver to abruptly stop at a traffic light that had turned green when all of the vehicles had begun moving forward in bumper to bumper traffic). For example, the majority concludes that because Saleme testified that he traveled the highway numerous times prior to the accident, he should have reasonably anticipated another motorist to unexpectedly change several lanes of traffic at the bottom of the overpass. No case has ever applied the reasonable time and place requirement of an abrupt stop to an unexpected lane change. Here, the majority opinion not only expands legal requirements without precedent, it also makes factual determinations that were properly placed and decided by the jury. With all due respect, it is fanciful for the majority to find that a motorist driving on a three-lane highway, along with other vehicles also traveling at high rates of speed, should expect, as a matter of law, that another motorist would rapidly traverse three lanes of highway traffic. Once Saleme presented credible evidence of an unexpected and rapid three-lane change by Trooper Lozano, the presumption was adequately rebutted and the trial judge properly placed the issue of negligence before the jury.
Moreover, I am perplexed by the majority's holding that Saleme did not effectively rebut the presumption because the accident was a result of Saleme's own negligence. The majority's conclusion that there was no evidence of a sudden lane change by Trooper Lozano is simply belied by the testimony at trial. Saleme testified that he was able to see the side mirror on Trooper Lozano's patrol car and Trooper Lozano looking at him as he crossed into the left lane. At this time, Saleme stated that he only had one or two seconds to react before striking the rear bumper of the patrol car. Furthermore, Trooper Lozano testified that he "floor[ed] the car . . . having it go[] as fast as it could go" and crossed the right lane, middle lane, and into the left lane of the highway. Additionally, Trooper Lozano testified that he was simply trying to observe the actions of the speeding motorcyclists and, therefore, did not turn on his sirens or the flashing police lights on top of his patrol car. Moreover, Bermudes, an eye witness, testified that when he drove over the crest of the overpass, he saw the FHP patrol car travel from the right side of the roadway to the left most southbound lane, and that there "wasn't much" distance between Saleme's motorcycle and Trooper Lozano's FHP patrol car at the time Trooper Lozano crossed into the left lane in front of Saleme. With all due respect to my colleagues, this evidence is more than sufficient to conclude, as the very able trial judge did, that Trooper Lozano made a sudden lane change.[5] Furthermore, contrary to the majority's conclusion, it is clear from the evidence that because neither party was entirely without fault, the trial court correctly submitted the issues to the jury to determine the question of liability and apportionment of damages. Alford, 936 So.2d at 650 (citations omitted).
The majority also mentions that because Saleme could have avoided the accident, his negligence was the sole proximate cause of the accident. Far from being a legal requirement to successfully rebut the presumption of negligence, the issue of whether the accident was avoidable was also a question for the jury's consideration. Thus, the trial court was entirely correct *981 in its submission of the issue to the jury, and the jury acted within its authority in finding that Trooper Lozano was fifteen percent (15%) negligent.
Notably, the majority's decision is in conflict with the Fifth District's recent opinion in Alford. In Alford, the Fifth District addressed the precise issue before us, whether the presumption of negligence attached to a rear driver who provided evidence of a sudden lane change and whether the rear driver was entitled to summary judgment. Id. at 651. In Alford, the record showed that the lead driver was stationed on the shoulder of southbound I-75, and subsequently re-entered the roadway crossing the right, middle, and over into the left lane, thereafter colliding with the rear vehicle. Id. at 648. The rear driver provided evidence that the lead driver may have improperly changed lanes and the lead driver provided evidence that the rear driver was not alert and failed to maintain a safe distance. Id. at 648-49. The court applied Florida precedent recognizing that a sudden lane change effectively rebuts the presumption of negligence and, therefore, concluded "that the case should be submitted to the jury without the presumption to determine whether one or both parties were negligent and, if so, to what extent." Id. at 649-51. Thus, the Alford court properly found that "if there is conflicting evidence in the record whether the lead vehicle changed lanes suddenly or unexpectedly, summary judgment was improper and the case should be submitted to a jury." Id. at 650-51 (emphasis added).[6]
The majority attempts to distinguish Alford on the ground that the plaintiff therein was the lead driver while the plaintiff in this case was the rear driver. Respectfully, this is a distinction without a legally significant difference. On the contrary, the legal effect of the rear-end collision rule applies and the purpose of the presumption is equally served, regardless of whether it is the lead driver or the rear driver who initiates the lawsuit. Notably, there is no authority cited for their attempt to distinguish Alford.
Here, as in Alford, there exists sufficient conflicting evidence concerning whether or not Trooper Lozano made a sudden and unexpected lane change. Trooper Lozano admitted that he "floor[ed] the car . . . having it go[ ] as fast as it could go" and crossed the right lane, middle lane, and into the left lane of the highway, while Saleme stated that he only had one or two seconds to react before striking the rear bumper of the patrol car. Furthermore, the evidence reveals that Trooper Lozano may have improperly changed lanes without ascertaining whether such movement could be made with safety. See ß 316.089(1), Fla. Stat. (2001)("A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.").
The majority dispenses with and resolves the conflicting evidence concerning Lozano's sudden lane change by applying a "we know best" standard of review. Moreover, throughout the majority opinion, they impermissibly view the evidence in the light most favorable to the defendant, FHP. In stark contrast, the trial court properly considered the evidence adduced at trial in the light most favorable to the plaintiff, as it must on a motion for a directed verdict, and properly denied FHP's motions. See Martinolich v. Golden Leaf Mgmt., Inc., 786 So.2d 613, 614 *982 (Fla. 3d DCA 2001) ("In determining a motion for directed verdict, the evidence, and all reasonable inferences [sic] therefrom, must be viewed in a light most favorable to the non-moving party.") (quoting Woods v. Winn Dixie Stores, Inc., 621 So.2d 710, 711 (Fla. 3d DCA 1993)).
Here, the conflicting evidence in the record concerning whether the lead vehicle changed lanes suddenly or unexpectedly, viewed in the light most favorable to the plaintiff, clearly precluded entry of a directed verdict. See Alford, 936 So.2d at 650-51. Therefore, the case was properly submitted to the jury without the presumption of negligence to determine whether one or both parties were negligent and, if so, to what extent. Id. at 649-51. Regardless of whether or not we agree with their decision, the jury was entitled to weigh the evidence and the credibility of the witnesses in apportioning negligence. Thus, the jury's finding that Trooper Lozano was fifteen percent (15%) negligent was entirely permissible and must be affirmed.
NOTES
[1] Sergeant Fernandez testified that the trooper's vehicle was five feet, five inches wide (65 inches) and that Saleme struck the vehicle thirty-five inches to the left of the right fender (or 35 inches from the right), which is essentially the center of the vehicle.
[2] Saleme had no idea how fast he was traveling. However, one of the two cyclists traveling with him testified that they were traveling between 65 and 70 miles per hour before Saleme sped up to catch the cyclist who sped past them at speeds clocked on radar as exceeding 100 miles per hour. An accident reconstruction expert testified that, based on standard calculations and known information about this crash, Saleme was traveling between 80 and 85 miles per hour before hitting the cruiser.
[3] The majority uses Sergeant Fernandez's expert testimony regarding timing and distance to calculate new time and distance figures that are not included in the record. Additionally, the majority uses these mathematical calculations to draw inferences that a jury is better suited to determine.
[4] The purpose of the "rear-end collision rule" is based on the need to lessen the lead driver's burden of proving two of the elements of negligence, breach and causation. Alford, 936 So.2d at 649 (citations omitted). This necessity arises from the fact that it is difficult for the lead driver to establish causation in most rear end collision cases because the driver's attention is focused on the events in front of the vehicle. Id.
[5] Actually, the evidence "fairly and reasonably" showed that Trooper Lozano made three (3) sudden lane changes. As he "floored his vehicle," Trooper Lozano traversed the right lane from the shoulder, then into the middle lane, and finally into the left lane, where Saleme was driving.
[6] In direct conflict with this holding in Alford, the majority opinion in this case holds that "even if there had been evidence presented of a sudden lane change by Trooper Lozano, a directed verdict in favor of Trooper Lozano was required. . . ."