768 So.2d 468 (2000)
Janet DINALLO, Karen Dinallo and Elaine Dinallo Mazzella, Appellants/Cross-Appellees,
v.
GUNSTER, YOAKLEY, VALDES-FAULI & STEWART, P.A., and Downey & Downey, P.A., Appellees/Cross-Appellants.
Nos. 4D99-0373, 4D99-0645.
District Court of Appeal of Florida, Fourth District.
June 28, 2000.
Rehearing Denied October 19, 2000.
*469 Abraham M. Mora and David M. Halpen of Kaye, Scholer, Fierman, Hays & Handler, LLP, West Palm Beach, for Appellants/Cross-Appellees Janet Dinallo and Karen Dinallo.
G. Michael Keenan of G. Michael Keenan, P.A., West Palm Beach, for Appellant/Cross-Appellee Elaine Dinallo Mazzella.
David P. Ackerman of Ackerman, Link & Sartory, P.A., and Jack J. Aiello of Gunster, Yoakley, Valdes-Fauli & Stewart, P.A., West Palm Beach, for Appellee/Cross-Appellant Gunster, Yoakley, Valdes-Fauli & Stewart, P.A.
WARNER, C.J.
This appeal arises from a final judgment enforcing an attorney's charging lien for attorney's fees in connection with the representation of beneficiaries in a complex probate case. The law firms cross-appeal the trial court's valuation as to the Juno Associates asset. The appellants/clients complain that the trial court erred in its interpretation of the fee agreement between the parties and as a consequence erred in valuing estate assets, which was the basis of calculation of the attorney's fee. Because the agreement was ambiguous, the court interpreted the agreement in favor of the position of the attorneys based upon the evidence presented. We affirm the trial court's ruling, except as to the inclusion of the value of tax savings and a non-existent asset for the attorney's fee calculation.
This case concerns a dispute over attorney's fees in a large and complex probate case. On October 29, 1991, Richard Dinallo died, only six days after executing a will that substantially disinherited everyone from a former will except for his wife, Lillian Dinallo. Richard's children (Janet Dinallo and Karen Dinallo) and his sister (Elaine Dinallo Mazzella) (i.e. the clients), hired the Gunster Yoakley law firm and Edward Downey to represent them in a potential will contest action. (Downey subsequently left Gunster and formed his own law firm, which also represented the clients).
After extensive negotiation, the clients and the law firms signed an attorney's fee agreement which provided that the law firms' fee would be a contingency fee based on a sliding scale of the "net recovery" of assets for the clients during the probate litigation. "Net recovery" is defined in the agreement, in relevant part, as:
the total recovery of assets (after the payment of all estate taxes, administration expenses and debts legally charged against those assets but before the calculation of the fee set forth herein), determined at their value as finally accepted for federal estate tax purposes which are actually distributed to the clients free and clear of estate claims (hereinafter "distribution") as a result of settlement negotiations, final hearing or trial....
*470 Thus, the parties agreed to use the federal estate tax value to measure the value of each asset distributed by the estate.
The law firms initiated a will contest action on behalf of the clients. This action was ultimately settled and the law firms' representation of the clients ceased in December of 1993. As a result of the settlement, Dinallo's residuary estate was divided up, and each of the clients received a percentage thereof. Also, pursuant to the settlement agreement, Lillian was not responsible for any estate taxes. Thus, the clients (Janet, Karen, and Elaine) were required to pay 80% of the estate taxes (the other 20% was paid by other beneficiaries).
In December 1993, at the conclusion of the litigation and settlement, the residuary estate was valued at $5,010,696 before the payment of expenses of administration, taxes and outstanding debts, of which the clients' share was $2,441,357. These assets consisted of various New Jersey entities, the Claridge Apartments, Juno Associates, a promissory note, and Palm Limited.
The estate owed more than $2 million in taxes, fees and expenses. Therefore, the estate was forced to liquidate some of the assets before the estate could be settled and the clients could receive their share. All of the proceeds were used to pay administration expenses. In that same month, the law firms terminated their representation, concluding that their duties under the fee agreement had been completed.
In 1995, the Claridge Apartments were sold. A distribution was made to each client in accordance with her share of the residuary. Because of the charging lien, attorney's fees were paid from the clients' share to the law firms in accordance with the percentage contained in the fee agreement.
By 1997, the estate taxes had still not been paid, and the estate needed to be closed. The assets held by Juno Associates had appreciated in value significantly and could be sold to pay the taxes and expenses. For tax reasons, partnership interests in the estate were assigned to each of the clients upon approval of the probate court and on the condition it would not prejudice the law firms' fee. Through a complex agreement, the clients received charitable tax deductions for the sale of the property to the Nature Conservancy, and the cash from the transaction was received by the estate. The estate and the clients entered into refunding agreements, providing that the clients would return the assets to the estate if further funds were needed to pay the estate taxes and expenses. By this infusion of cash, the estate paid its taxes and expenses, and the remaining assets of the estate were distributed to the clients free of any claims.
The lawyers moved to have the court determine their attorney's fees. At trial the law firms calculated that the clients had received distributions from the estate that resulted in a $710,393 (plus interest) attorney's fee. These distributions included $578,500 from promissory notes and $157,533 from insurance tax savings.
The promissory notes were the subject of litigation between the estate and the clients. The estate sued the clients prior to the ultimate settlement of all claims, contending that checks from the decedent to the clients which were marked "loan" constituted debts of the clients owed to the estate. The clients contended that these were in fact gifts. In addition, the clients countersued the estate for monies owed to them based on their interest in various corporations and partnerships owned by decedent. The law firms agreed to represent the clients in this matter for a percentage of the "total recovery of assets received by the client in conjunction with the litigation." This litigation was finally settled with the agreement providing that the "promissory note" of each client was to be distributed to that client as a way of paying each client's counterclaim against the estate. The law firms contended that *471 this was a recovery of $578,000 for the clients, while the clients contended that because it received the "notes" in exchange for settlement of their counterclaim, there was no "recovery from the estate." The transaction was a wash.
The law firms also claimed that the clients "recovered" tax savings from having the estate pay the taxes on insurance proceeds which were passed through the probate estate. Based on the overall settlement, the clients had an 80% interest in the proceeds of the policy. The law firms claimed at trial that they saved the clients $157,533 in taxes on the policy by moving it "through" the estate as opposed to having the policy paid directly to the beneficiaries. The clients, however, argued that because they were obligated to pay 80% of the taxes of the estate, they in effect paid 80% of the taxes on the policy proceeds.
The law firms contended that where assets were sold and liquidated prior to distribution, then the federal tax valuation does not apply, and their fee should be valued on the entire amount actually distributed to the clients without deduction for taxes and expenses, because those were paid prior to distribution. The clients object to this interpretation, noting that to construe it that way would mean that they would be paying a fee based upon the appreciated value of the property, the avoidance of which was the purpose of valuing assets at the federal tax value.
At trial, the court relied on the law firms' method of calculating the fee based upon actual distributions to the clients, except in the case of the Juno Associates property. Instead of the cash distribution made as a result of the liquidation of Juno Associates described above, the court valued the distribution of Juno Associates at $1,259,896, its federal estate tax value, thus reducing the fee claimed to a principal amount of $650,992.50. The court awarded that amount plus interest and reserved jurisdiction to award additional fees on any subsequent distributions from the estate to the clients.
We have carefully reviewed the fee agreement, as well as the arguments of counsel. On the one hand, the agreement uses the federal tax value of assets, but on the other hand it bases the fee on those assets actually distributed to the clients. In most instances, assets were liquidated to pay taxes and debts. Thus, what was actually distributed was cash. We conclude that there was an ambiguity in the contract, and where the agreement is ambiguous, the court may receive extrinsic evidence to determine the intent of the parties. See Gorman v. Kelly, 658 So.2d 1049, 1052 (Fla. 4th DCA 1995); Elmore v. Enterprise Developers, Inc., 418 So.2d 1078, 1079 (Fla. 4th DCA 1982). The trial court's ruling with respect to the contract in such cases should be sustained if supported by competent substantial evidence. See Alternative Dev., Inc. v. St. Lucie Club and Apartment Homes Condominium Ass'n, 608 So.2d 822, 828 (Fla. 4th DCA 1992); Elmore, 418 So.2d at 1079. In this case, the trial court listened to the testimony of Edward Downey with respect to the fee agreement. The trial court also had copies of prior, unapproved versions of the fee agreement, which based the fee on assets distributable, rather than actually distributed, to the beneficiaries. After reviewing the evidence, we conclude that the trial court's ruling was supported by competent substantial evidence.
We do, however, agree with the clients that the tax savings on the insurance policy were not all assets "actually distributed" to the clients. Because the settlement agreement required the clients to pay 80% of the taxes on the estate, the clients actually paid that portion of the tax savings through the estate. Thus, the resulting tax savings to the client were only $31,506. Furthermore, with respect to the promissory notes received, these were not "actually distributed" because they did not in fact exist. In addition, their value, if any, was offset by the claims against the estate which the clients settled. Since the *472 clients received nothing as a result of this litigation, the court erred in including the $578,000 for the notes in the fee calculation.
We affirm as to the remaining points raised. Thus, we reverse in part and remand to correct the fee calculation in accordance with this opinion.
SHAHOOD and GROSS, JJ., concur.