34 So.3d 28 (2010)
Sally SCHMACHTENBERG n/k/a Sally McHugh, Appellant,
v.
Lee C. SCHMACHTENBERG, Appellee.
No. 3D08-2508.
District Court of Appeal of Florida, Third District.
February 24, 2010.
Rehearing and Rehearing En Banc Denied May 28, 2010.
*30 Nancy A. Hass, Hallandale, for appellant.
Ross & Girten and Laurie Waldman Ross; Buckner, Shifrin, Rice & Etter and Deanna S. Shifrin, Miami, for appellee.
Before WELLS, CORTIÑAS and SALTER, JJ.
WELLS, Judge.
Sally McHugh appeals from an order modifying the child support and permanent periodic alimony awards of a final judgment of dissolution of marriage. We reverse the modification of child support, finding that the marital settlement agreement incorporated into that judgment is clear and unambiguous and in need of no clarification, and that there is no basis in this record to support modification of that award. We reverse the modification of permanent periodic alimony, finding that the lower court erred in determining the amount by which that award was to be modified.
*31 The parties were divorced in December of 2002 following an almost 30-year marriage which produced a single child, a disabled son, 25 years old when the marriage was dissolved. The divorce decree incorporated a mediated marital settlement agreement, which equitably divided the parties' assets and liabilities and provided support for both Ms. McHugh and the parties' adult disabled son. As to Ms. McHugh, the final judgment required Mr. Schmachtenberg to pay permanent periodic alimony in the amount of $5,250 per month:
V. ALIMONY
A. The husband will pay to the wife as permanent periodic alimony the sum of $5,250 (five thousand two hundred and fifty dollars) per month commencing December 1, 2002 and payable on the first day of each month thereafter. .... Said payments shall terminate upon the earlier of the remarriage of the wife or death of the wife or court order.
B. The alimony contained in this agreement is based on the husband's projected and estimated income of $250,000 (two hundred thousand five hundred) per year and the wife's projected and estimated income of $18,000 (eighteen thousand) per year. Neither party shall seek a modification of the alimony agreed to herein, based on the income earned in the year 2002.
As to the parties' son, the parties were required to transfer title to a condominium that they owned to a special needs trust so that their son had a place to live. Mr. Schmachtenberg also was required to continue to support his son as he had in the past:
XVII. PARTIES ADULT DISABLED CHILD

The husband agrees to support the parties' adult disabled child as he has done in the past. The husband's support shall be a supplement, but not supplant the child[']s government benefits and shall be subject to modification in accordance with the child's needs. The parties agree to act in a manner to safeguard the child's receipt of government benefits. All additional provisions related to the parties' adult disabled child who is still dependent shall be governed by the decision of the probate court or by further agreement.
XVIII[.] PROPERTY LOCATED AT [] MARIPOSA

The property located at [] Mariposa [] Coral Gables, Florida shall be transferred by the husband and wife to a Special Needs Trust, the form of which shall be determined by the parties' respective Probate attorneys and/or the Probate court. ....
Following the divorce, Ms. McHugh and the Miami-Dade County Guardianship Program were appointed joint guardians of the parties' son and his property.
In October 2006, a little less than four years after the divorce, Mr. Schmachtenberg petitioned for clarification and/or modification of the mediated settlement agreement relating to the support of the parties' son.[1] Arguing that increases in his son's expenses were causing friction between the parties, Mr. Schmachtenberg claimed that his continuing obligation to support his son as he had in the past had *32 become vague and ambiguous, justifying either clarification or modification. Mr. Schmachtenberg simultaneously petitioned for modification of the permanent periodic alimony award, claiming only that his current income was "substantially less than the income estimated at the time of the Final Judgment."
Following a two day trial, the court below entered an order modifying Mr. Schmachtenberg's child support obligation relieving him of his agreed-to obligation to pay for all of his disabled son's expenses not covered by SSI payments. Instead, Mr. Schmachtenberg was ordered to pay all of the mortgage, taxes, insurance, and condominium fees on the condominium in which his son lived and only one-half of his son's uncovered medical, dental, and psychological care. Henceforth, he was relieved of any obligation to pay his son's utilities. Ms. McHugh was ordered to pay the remaining half of her son's medical expenses.
The trial court further modified the child support provisions of the marital settlement agreement to apply the child support guidelines thereby making each party responsible for a portion of their child's support. Relying on income imputed to Ms. McHugh at the time of the parties' 2002 divorce ($18,000 a year from prior employment by Mr. Schmachtenberg), combined with an additional $24,795 a year in imputed "income" from "recurring gifts" from her parents, the court below applied the statutory child support guidelines to order Mr. Schmachtenberg to pay $936 per month in child support and Ms. McHugh to pay $638 per month to support their son. Based on this formulation, the court below concluded that Ms. McHugh would have ample funds to pay for the son's needs and many of his wants, including, for instance, a new computer or cell phone.
The permanent periodic alimony provisions of the final judgment likewise were modified. Based on a determination that Mr. Schmachtenberg's current before tax income was only $124,391, compared with a before tax income of over $300,000 in 2001 (the last full year before the divorce), the court concluded that a substantial change in circumstances had occurred to warrant an alimony modification. Imputing both the amount of income imputed to Ms. McHugh at the time of the divorce some six years earlier ($18,000), and, on the authority of Ordini v. Ordini, 701 So.2d 663 (Fla. 4th DCA 1997), an additional $2066 per month representing the average amount given to her over the years by her parents, the court modified Ms. McHugh's alimony award from $5250 per month to $1800 a month, retroactive to the date of the order of modification. Ms. McHugh was also ordered to repay Mr. Schmachtenberg for any overpayment of alimony during pendency of these proceedings.
For the following reasons, we reverse both the modification of the child support provisions of the parties' settlement agreement and, in part, the modified alimony award.

A. CHILD SUPPORT

We reverse the order "clarifying" the child support provisions of the final judgment because the mediated settlement agreement incorporated into that judgment is clear and unambiguous and in need of no clarification. We also find no basis in this record to support modification of that award.
A marital settlement agreement that has been ratified by the trial court "is subject to interpretation like any other contract." Ballantyne v. Ballantyne, 666 So.2d 957, 958 (Fla. 1st DCA 1996); see Levitt v. Levitt, 699 So.2d 755, 756 (Fla. *33 4th DCA 1997) ("It is well settled that a marital settlement agreement is subject to interpretation like any other contract."). Accordingly, terms contained in such agreements should be given their plain meaning and "not be disturbed unless found to be ambiguous or in need of clarification, modification, or interpretation." Ballantyne, 666 So.2d at 958; see Levitt, 699 So.2d at 757 ("It is only when a term in a marital settlement agreement is ambiguous or unclear that the trial court may consider extrinsic evidence as well as the parties' interpretation of the contract to explain or clarify the ambiguous language."); see also Andersen Windows, Inc. v. Hochberg, 997 So.2d 1212, 1214 (Fla. 3d DCA 2008) ("Courts, without dispute are not authorized to rewrite clear and unambiguous contracts. And where a contract is clear and unambiguous, it must be enforced as written.") (citation omitted).
In this case, no ambiguity was alleged to exist. Rather, the petition for modification alleges only that Mr. Schmachtenberg's contractual obligation to financially support his son, as he had "done in the past," had gradually increased over time, causing friction between the parties:
3. Pursuant to the Mediated Marital Settlement Agreement, the Former Husband agreed to provide support to the parties' adult disabled son. ... More specifically, the Agreement provides as follows:
XVIII. PARTIES ADULT DISABLED CHILD: The husband agrees to support the parties' adult disabled child as he has done in the past.
4. The subject adult disabled son has a condition called Tuberous Sclerosis, presenting symptoms of mental impairment and childlike behavior. The Former Husband is presently paying on behalf of the parties' adult disabled son the following expenses: (a) mortgage payment for condo where son resides, (b) taxes and insurance for condo where son resides[,] (c) association maintenance fee for condo where son resides, (d) son's cell phone, (e) son's utilities including DSL and cable, (f) food and other expenses.
5. The provision in the Agreement requiring the Former Husband to support his son as he has done [in] the past requires clarification, as the language therein is vague, ambiguous, and therefore subject to differing interpretations, especially with the passage of time. More specifically, the Former Husband's support of the son at the time of the Final Judgment, as "done in the past", was significantly less than the expenses currently being paid by him. Notwithstanding this fact, the Former Wife is dissatisfied with the support which leads to hostility affecting adversely the son.
6. Accordingly, the provision in the Agreement as to the support of the parties' adult disabled son should be clarified and or subject to the Child Support Guidelines.
These allegations demonstrate no ambiguity in need of clarification. Moreover, no ambiguity was proved to exist. To the contrary, the testimony was that Mr. Schmachtenberg paid all of his son's expenses before the parties' divorce, and that he had continued to do so afterward, all as contemplated by the parties' agreement. There was, therefore, no basis for clarification.
There also was no basis on which the marital settlement agreement could be modified to reduce Mr. Schmachtenberg's obligation to fully support his son in favor of applying the statutory child support guidelines to impose some or all of those costs on his former wife. Under section 61.13(1)(a) of the Florida Statutes, support *34 obligations detailed in a final judgment of dissolution of marriage may be modified in three circumstances: (1) where there is a substantial change in circumstances; (2) where modification is necessary for the best interests of the child; or (3) where the child has attained majority. § 61.13(1)(a), Fla. Stat. (2007); see Overbey v. Overbey, 698 So.2d 811, 813 (Fla. 1997). Where, as here, a child support award is based on an agreement incorporated into a final judgment, "a heavier burden rests on the party seeking a reduction than otherwise would be required." Overbey, 698 So.2d at 814 (citation omitted).
In this case, no substantial change in circumstances was demonstrated to support modification of Mr. Schmachtenberg's agreed-to support obligation. As both Mr. Schmachtenberg and his attorney confirmed, no substantial change in circumstances exists:
[By counsel for Mr. Schmachtenberg]:... The former husband pays now, and always has paid the mortgage on the Mariposa condominium [where the son lives], the property taxes on the Mariposa condominium, the condo fees, and special assessments on the Mariposa condominium. All of [the son's] utilities, his cable, his Internet, his home phone, his cell phone, and his uncovered medical bills, including therapy that he is now in, in which he didn't need before the guardianship.
The only thing that has changed ever is that before the parties' dispute started, when they were first divorced, Mr. Schmachtenberg managed [their son's] SSI. He was the one that received the payment, and he used that money to buy [the son's] groceries and give [the son] an allowance.
Now [Ms. McHugh] receives the SSI, and she provides [the son's] groceries.

So from [Mr. Schmachtenberg's] own standpoint, nothing has changed, but [Ms. McHugh] ... is dissatisfied with the amount of support, and is always sending letters and other things saying, you need to get [the son] a state-of-the-art computer, you need to get him a state-of-the-art phone. ...
. . . .
Q. [by counsel for Mr. Schmachtenberg]. Has anything changed from what support you were providing at the time of the divorce and what you're doing now?
A. [by Mr. Schmachtenberg]. No, it has slightly increased, as I indicated the cable has increased.
. . . .
Q. Do you have a problem with the paying of the expenses that you have been paying?
A. No, I do not. ...
(Emphasis added).
Mr. Schmachtenberg clearly failed to sustain the burden imposed on him to demonstrate a substantial change in circumstances.
He also failed to demonstrate that it is in his disabled son's best interests to decrease the amount of support that he agreed to pay in favor of imposing those costs on Ms. McHugh. The record is that Mr. Schmachtenberg has the financial ability to pay, and consistently has paid, for the goods and services needed by his son; whereas, Ms. McHugh has no income from which to pay such costs. It cannot, therefore, be said that it is in this child's best interests to impose a portion of his expenses which are currently being paid by his father, who can afford to pay them, on his mother who has no ability to pay them. And, while there is testimony that the parties do from time to time disagree as to the amount that should be paid for particular items or services (such as computers or *35 cell phones) for this disabled child, and that these disagreements are disruptive to all of the parties, there is no testimony that these disagreements have proved so harmful to this child that Mr. Schmachtenberg's support obligations to him should be decreased. This is especially so since the marital settlement agreement itself contemplates that such matters will be addressed and resolved by the probate court.[2]
In short, neither clarification nor modification of the child support provisions of the marital settlement agreement incorporated into the final judgment should have been granted.

B. PERMANENT PERIODIC ALIMONY

While we agree that the circumstances warrant modification of Mr. Schmachtenberg's obligation to pay permanent periodic alimony, we find that the court below erred in determining the amount by which that award was to be modified.
An alimony award contained in a final judgment may be modified where a substantial, material, involuntary, and permanent change in circumstances not contemplated at the time the final judgment has occurred. Eisemann v. Eisemann, 5 So.3d 760, 762 (Fla. 2d DCA 2009). The record in this case shows that in 2002, the year in which the parties entered into their marital settlement agreement, Mr. Schmachtenberg's gross income was approximately $131,000. In 2003, it was approximately $170,000; in 2004, approximately $129,000; in 2005, approximately $148,000; in 2006, approximately $151,000; and in 2007, approximately $147,000.[3] While it is clear that Mr. Schmachtenberg's income increased between the date of the parties' agreement and the date of the modification, we cannot say that the court below abused its discretion in granting a modification in light of the fact that the year before the parties entered into their agreement Mr. Schmachtenberg's before tax income was over $300,000 and the parties expressly stated in their marital settlement agreement that the $5250 alimony agreed upon was based on "the husband's projected and estimated income of $250,000" per year. There is no dispute that this level of income has not been duplicated since then. For this reason, we agree that modification of the amount of the permanent periodic alimony award was warranted.
The record does not, however, for a number of reasons support the drastic reduction in that award from $5250 to $1800 per month ordered below. First, Mr. Schmachtenberg's "before tax" income should not have been reduced from $147,214 to $124,391 to give him credit for a purported rental loss on the condominium (unit 361) that he received as part of the parties' divorce settlement. The testimony was that the parties owned this unit before the divorce, and that Mr. Schmachtenberg lived in it both before and after the divorce. After Mr. Schmachtenberg remarried, and he and his new wife moved into another condominium, he kept unit 361 permitting his elderly parents to live *36 there. After they died, he continued to own the unit, now worth over $600,000, using it as a cash cow and borrowing over $200,000 against itrather than using his own substantial funds (including a $500,000 inheritance from his parents)to pay for personal expenses (including tens of thousands of dollars to maintain his 52 foot yacht).
Below, he sought to reduce his gross income in an amount equal to $37,295.69 claiming that he had incurred $63,465.84 in expenses related to this unit (derived from first and second mortgage payments ($34,189.08), property taxes ($10,593.16), maintenance fees ($10,030.96), cable TV bills ($727.32), electricity charges ($1,350), brokerage commissions ($2267), repair costs ($3,877.04), and telephone expenses ($431.28)), but had earned only $26,170.15 in rental income. The court below, while not allowing Mr. Schmachtenberg to deduct the entire $37,295.69 as a rental loss to reduce his gross income, permitted him to deduct $22,823 after concluding that he should receive no credit for payments made on the line of credit secured by the condominium (a little over $14,000) because he had used the funds from this loan for his own purposes.
While we agree that Mr. Schmachtenberg was entitled to no credit for payments made toward the line of credit secured by this property, he should have received no deduction for any portion of the expenses relating to it. A former spouse cannot reduce his or her disposable income by voluntarily incurring debt. See Yangco v. Yangco, 901 So.2d 217, 221 (Fla. 2d DCA 2005); Dykes v. Dykes, 712 So.2d 1189, 1193 (Fla. 1st DCA 1998) ("Alimony may not be reduced merely because the petitioner seeking the reduction has voluntarily incurred new financial obligations which make it difficult to meet his or her alimony obligations."). That is precisely what Mr. Schmachtenberg did here, first by keeping unit 361 long after he and his parents stopped living there and long after he moved into another condominiuma condominium encumbered by a $195,000 mortgage and listed for sale at over $1.3 millionand now by claiming an income loss because he had recently decided to treat this $600,000 asset as a rental property. On these facts and the record before us, no deduction from gross income for this purported rental income loss should have been allowed.
Income also should not have been imputed to Ms. McHugh for the purpose of determining the amount of alimony Mr. Schmachtenberg should pay. There is no dispute that Ms. McHugh is currently unemployed and has engaged in no meaningful employment since the parties' divorce in 2002. The undisputed record is, therefore, that her current income is $0. Rather than using that number as a basis for determining need and thus the amount of alimony Mr. Schmachtenberg should currently pay, the court below imputed $18,000 in income to Ms. McHugh, which is the amount the parties agreed to impute to her in 2002 when they executed their marital settlement agreement. The court also imputed an additional $2066 per month from gifts from her parents. This was improper.
The standard of review for a trial court's imputation of income is whether there is competent, substantial evidence to support it. See Gruber v. Gruber, 857 So.2d 329, 330 (Fla. 2d DCA 2003) (stating the standard of review when considering imputation of income "is whether the trial court's determination is supported by competent, substantial evidence"); Wendel v. Wendel, 805 So.2d 913, 914 (Fla. 2d DCA 2001) (same). Income may be imputed to a spouse only where there is competent, substantial evidence which establishes *37 "the current job market, [the spouse's] more recent work history, [the spouse's] occupational qualifications, and the prevailing earnings level in the local community where [that spouse] and [her] family live[s]." Rabbath v. Farid, 4 So.3d 778, 782 (Fla. 1st DCA 2009); Gruber, 857 So.2d at 331 (finding no competent, substantial evidence to support the imputation of income to the former spouse where the record contained "no evidence or testimony that the former [spouse] was employable or capable of earning income"). This evidentiary burden was not satisfied in this case.
The record in this case is that while Ms. McHugh has both a college degree and a real estate license, she has not held meaningful full-time employment since the 1970's. The last meaningful part-time employment she enjoyed was in Mr. Schmachtenberg's law office where she assisted in real estate related work. Since the divorce in 2002, Ms. McHugh has sold only two properties as a real estate agent and has spent most of her time assisting the parties' disabled son.[4] Other than this, there is no evidence that, now at age 58 and many years outside the workplace, Ms. McHugh is employable except as a real estate agent. As to this (or for that matter any other) line of work, there is no evidence whatsoever as to the current job market or as to the prevailing earnings level for such agents in the community where Ms. McHugh lives. Absent such evidence, income could not be imputed to her.
The amount imputed to Ms. McHugh in the 2002 marital settlement agreement, as the agreement itself confirms, did not represent her actual annual income, but represented no more than an estimate of potential future earnings:
The alimony contained in this agreement is based on the husband's projected and estimated income of $250,000 (two hundred thousand five hundred) per year and the wife's projected and estimated income of $18,000 (eighteen thousand) per year. Neither party shall seek a modification of the alimony agreed to herein, based on the income earned in the year 2002.
As we know, the "projected and estimated" income imputed to Mr. Schmachtenberg in this agreement did not come to fruition; nor, as the record confirms, did Ms. McHugh's. This estimate should not, therefore, have been attributed to her now for the purpose of determining either alimony or child support.
Nor should any amount have been imputed as income to her because her parents gave her money to make ends meet. In Rogers v. Rogers, 824 So.2d 902, 903 (Fla. 3d DCA 2002) (quoting Bromante v. Bromante, 577 So.2d 662, 663 (Fla. 1st DCA 1991)), this Court confirmed that when determining need and ability to pay alimony or child support, "the general rule is that the trial court may only consider the `financial resources of the parties and not the financial assistance of family or *38 friends.'" see also Oluwek v. Oluwek, 2 So.3d 1038, 1039 (Fla. 2d DCA 2009). We also recognized that an exception to this general rule exists where such "gifts are continuing and ongoing, not sporadic, and where the evidence shows that the gifts will continue in the future." Rogers, 824 So.2d at 903. But as the Ordini decisionwhich was relied upon by the lower courtconfirms, this exception does not apply here.
In Ordini, a husband and wife, both in their thirties, lived in a home supplied by the husband's father. Although the husband rarely actually went to work, he received a regular weekly "salary" (amounting to $6500 a month) from his father's business to cover his family's expenses. There also was testimony from the husband's mother that she would continue making these payments to him for his benefit and for that of his children and ex-wife after the divorce. On these facts, the Fourth District remanded the matter for the trial court to determine whether income should be imputed to the husband. Ordini, 701 So.2d at 666.
Nothing even remotely similar occurred here. Rather, Ms. McHugh testified that she had received substantial monetary gifts from her parents since the divorce to help her make ends meet. Mr. Schmachtenberg's expert testified that he had reviewed Ms. McHugh's bank statements and segregated all of the deposits made to her account from any source he could not identify. He then averaged these amounts to conclude that Ms. McHugh was receiving what amounted to $2,066 per month from her family. This amount was imputed as income to her by the court below.
However, as Ordini confirms, where a spouse receives sporadic sums (even if substantial) to defray living expenses, those sums cannot be imputed as income:
In Sol [v. Sol, 656 So.2d 206 (Fla. 3d DCA 1995)], which was a modification proceeding, the trial court granted an increase in child support, and included, in arriving at husband's income for the child support guidelines, $20,000 a year, based on gifts that the husband had received from his parents during the three years preceding the modification hearing. In reversing, the third district characterized the evidence as showing "large sporadic cash gifts ... which varied in frequency and amount over the preceding several years." Id. at 208. The court concluded that the "imputation of future gift income" to child support, under those circumstances was impermissible, citing Bedell v. Bedell, 583 So.2d 1005 (Fla.1991); Shiveley v. Shiveley, 635 So.2d 1021 (Fla. 1st DCA 1994); Bob v. Bob, 310 So.2d 328 (Fla. 3d DCA 1975).
. . . .
In Sol, ... the gifts were irregular in regard to both the amount and when they were made. In Bob, the wife's parents had been regularly helping the parties while the husband was in medical school, and the court held that the payments were "in all probability meant to be temporary," while the husband was being educated for a greater earning power. The court reversed an alimony award of thirty percent of the husband's income, holding that he was only obligated to support the wife in a standard of living which they could have maintained without the gifts from her parents.
. . . .
There are cases, however, in which gifts have been considered. The third district recently held that the trial court did not err in imputing income to the wife for purposes of child support, based on monthly payments of the wife's living *39 expenses by the wife's mother. Cooper v. Kahn, 696 So.2d 1186 (Fla. 3d DCA 1997). ... The court concluded that it was within the trial court's discretion to include ... gifts, which were "continuing and ongoing," and distinguished the "sporadic gifts" in Sol.

Id. at 664-665.
This is especially so, according to Ordini, because a spouse struggling to survive on inadequate support should not be presented with the Hobson's choice of either starving to death or risking loss of already inadequate support by accepting family largesse:
In Bedell [v. Bedell, 583 So.2d 1005, 1008 (Fla.1991)], the ... husband argued that he should not have to pay more [alimony] because of the wife's mother's assistance. It is not surprising that the supreme court rejected the husband's argument because a spouse on the receiving end, who is being given assistance because of inadequate support, would be in a catch-22 if courts were to reduce support obligations for that reason.
Id. at 665.
That is precisely what happened here. The record in this case is that Ms. McHugh received substantial monetary gifts from her parents following the divorce. There is no evidence that these gifts were made on a regular, ongoing basis or that they would continue in the future. Absent such evidence, Ordini does not apply, and amounts received by Ms. McHugh from her parents should not have been imputed to her as income.
Ms. McHugh's alimony should not, therefore, have been reduced based on either a determination of Mr. Schmachtenberg's before tax income after deduction for rental loss and costs related to unit 316 or on income imputed to Ms. McHugh. On remand, any reduction in alimony must be based on evidence confirming both Ms. McHugh's need and Mr. Schmachtenberg's ability to pay predicated on a $147,000 gross income.
Accordingly, the order modifying the final judgment with regard to child support is reversed. The alimony modification is reversed as to amount and remanded for redetermination.
SALTER, J., concurs.
CORTIÑAS, J. (dissenting).
I must respectfully dissent. Unlike the majority, I would confine my decision to the applicable standards of review: a de novo standard to review whether a contract provision regarding child support in the marital settlement agreement was ambiguous and an abuse of discretion standard to review modification of the former husband's alimony obligations. Under those standards of review, I must affirm.
"Settlement agreements are contractual in nature and are therefore, interpreted and governed by contract law." Comm'l Capital Res., LLC v. Giovannetti, 955 So.2d 1151, 1153 (Fla. 3d DCA 2007) (citing Cadle Co. v. Schecter, 602 So.2d 984, 985 (Fla. 3d DCA 1992)). "Where a contract is susceptible to two different interpretations, each one of which is reasonably inferred from the terms of the contract, the agreement is ambiguous." Id. (citing Miller v. Kase, 789 So.2d 1095, 1097-98 (Fla. 4th DCA 2001)). "[W]hether an ambiguity exists in a contract is a question of law." Essex Ins. Co. v. Simpler, 911 So.2d 794, 794 (Fla. 1st DCA 2004). Therefore, "the standard of review applicable to the determination of whether a contract is ambiguous is the de novo standard of review." Weisfeld-Ladd v. Estate of Ladd, 920 So.2d 1148, 1150 (Fla. 3d DCA 2006) (quoting Wagner v. Wagner, 885 So.2d 488, 492 (Fla. 1st DCA 2004)). "Thus, `[t]o be judicially *40 enforceable ... a settlement agreement... must be sufficiently specific as to be capable of implementation. ... [C]ourts will not attempt to enforce a settlement agreement that is too vague or ambiguous in its meaning or effect.'" Gaines v. Nortrust Realty Mgmt., Inc., 422 So.2d 1037, 1039-40 (Fla. 3d DCA 1982) (quoting United Mine Workers of Am. v. Consolidation Coal Co., 666 F.2d 806, 809-10 (3d Cir. 1981) (citations omitted)). See also Rock-Weld Corp. of Puerto Rico v. Rock-Weld Equip. Corp. of Fla., 184 So.2d 186 (Fla. 3d DCA 1966) (stating that in order to constitute a settlement agreement, the language of the agreement must be clear).
The precise language of Article XVII of the marital settlement agreement, which the trial court reviewed, reads as follows: "The Husband agrees to support the parties' adult disabled child as he has done in the past. The Husband's support shall be a supplement, but not supplant, the child's government benefits and shall be subject to modification in accordance with the child's needs." (Emphasis added).
This language instigated six years of disputes between the former wife and the former husband. Relying on its vague pronouncement, the former wife characterized the adult disabled son's expenses (such as large screen TVs, computers, and cell phones) as "needs" while the former husband termed them "wants." The former wife testified to her belief that, "consistent with the terms of the parties' [a]greement, the former [h]usband was to provide for 100% of [the child's] expenses, whatever they may be." (Emphasis added). She believed that these comprised "all of [the child's] needs and that he would have the same type of lifestyle and things that he had during the parties' intact marriage," such as "a computer ... every other year ... cruises, European vacations, all different kinds of vacations ... a few thousand dollars for his birthday. ..." In contrast, the former husband testified that he believed the child "should be cared for, but he shouldn't be provided every single thing he wants." He sought a "defined definition" of his responsibility because the child's wants "were disproportionate and exaggerated, because of [his] medical condition, and his mother's encouragement." Considering the years of litigation resulting from the agreement, the former wife's counsel conceded that the marital settlement agreement was "poorly drafted" and "vague as to what [the child] was getting."
Not at all surprisingly, the trial court found Article XVII to be ambiguous and clarified it. The court derived its authority from section 61.13(1)(a), Florida Statutes, which authorizes modification of the amount and terms and conditions of child support when it is in the child's best interest to do so, concluding that "the litigation has caused distress to [the child][5] and it is in his best interest that the child support be defined as a sum certain." In addition, Article XVII itself provides that the child support was subject to modification "in accordance with the child's needs."[6]
The majority reverses the very able trial judge's determination of ambiguity by terming the above-referenced language "clear and unambiguous and in need of no clarification." Huh? Far from being a model of crystalline clarity, this language is so evidently unclear and obviously ambiguous that the correctness of the trial *41 judge's finding of ambiguity can only be undone and reversed through a "we know best" standard of review. See Dep't of Highway Safety & Motor Veh. v. Saleme, 963 So.2d 969, 978 (Fla. 3d DCA 2007) (Cortiñas, J., dissenting).
When the parties to an ambiguous contract suggest different interpretations, "the issue of the proper interpretation is an issue of fact requiring the submission of evidence extrinsic to the contract bearing upon the intent of the parties." Bacardi v. Bacardi, 386 So.2d 1201, 1203 (Fla. 3d DCA 1980). The trial court followed this procedure and ultimately accepted the former husband's interpretation of Article XVII. Despite precedent mandating that because "intent is an issue of fact, the trial court's ruling `should be sustained if supported by competent substantial evidence,'" Weisfeld-Ladd, 920 So.2d at 1150 (quoting Dinallo v. Gunster, Yoakley, Valdes-Fauli & Stewart, P.A., 768 So.2d 468, 471 (Fla. 4th DCA 2000)), the majority has intruded upon the trial court's fact-finding province and summarily determined the former husband's obligation is to pay "all of his son's expenses."[7]
Similarly, the majority eviscerates the abuse of discretion standard that appellate courts are required to use when reviewing orders modifying alimony and child support. See Leonard v. Leonard, 971 So.2d 263, 264 (Fla. 1st DCA 2008); Woolf v. Woolf, 901 So.2d 905, 911 (Fla. 4th DCA 2005). Judicial discretion is abused only
when the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable man would take the view adopted by the trial court. If reasonable men could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion.
Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla.1980) (quoting Delno v. Mkt. St. Ry. Co., 124 F.2d 965, 967 (9th Cir.1942)).
Here, the trial court, invested with authority by section 61.14(1)(a), Florida Statutes, made a modification order "as equity require[d], with due regard to the changed circumstances or the financial ability of the parties or the child, decreasing ... the amount of ... alimony provided for in the agreement or order." The court did so after "consider[ing] the relative financial circumstances of both parties at the time of the final judgment compared with the parties' relative financial circumstances when the petition for modification was filed" and determining that the former husband had demonstrated "a substantial, material, permanent change in circumstances which was not contemplated at the time the amount of alimony originally was set." Carls v. Carls, 890 So.2d 1135, 1137-38 (Fla. 2d DCA 2004) (citing Pimm v. Pimm, 601 So.2d 534, 536 (Fla.1992)).
The majority seems to forget that "[i]n reviewing a true discretionary act, [an] appellate court must fully recognize the superior vantage point of the trial judge...," who was in a position to "personally observe the participants and events of the trial." Canakaris v. Canakaris, 382 So.2d at 1202-03. Instead, after reciting the former husband's income for the past seven years, the majority concludes that he suffered "a substantial, material, involuntary, and permanent change in circumstances not contemplated at the time the final judgment ... occurred," entitling him *42 to a reduction in alimony,[8] yet spends several more pages analyzing numbers and rehearsing facts to explain its reversal of the amount of the trial court's modification. As the trial court had already evaluated the parties' ample testimony and record evidence in making its well-reasoned ruling, this Court should not have rehashed them and interfered with the trial court's discretionary power.
Accordingly, I would affirm.
NOTES
[1] The petition also sought reformation of the parties' agreement regarding transfer of title of the condominium in which their son lived. The parties agreed that this portion of their agreement should be reformed to protect the property and to assure that it would revert to them as contemplated in the event their son predeceased them. There is, therefore, no issue as to the reformation request that need be addressed here.
[2] The independent guardian is the logical person or entity to provide initial consideration, for any dispute between Mr. Schmachtenberg and Ms. McHugh regarding the adult disabled child's needs. Mediation of any such disputeswhich are matters of enforcement, not modification of the marital settlement agreementwould also be advisable.
[3] The 2007 figure is derived from $91,057 from Mr Schmachtenberg's professional association; a $5,132 "addback" for non-recurring professional fees; $13,164 from his title insurance company; $7,654 in dividends and interest; and $30,208 in fringe benefits.
[4] The testimony at trial was that after Ms. McHugh graduated from college she worked for a time in the early 1970's as a journalist. She then worked, again in the 1970's, for a couple of years teaching school while Mr. Schmachtenberg was serving in the Air Force in Italy. After Mr. Schmachtenberg set up his own law practice in 1991, she worked part-time at his firm for the next six years while their son was in school. Her responsibilities included preparing files for closings, assembling documents for lenders and doing post-closings. She thereafter obtained a real estate license, but she is not a licensed broker. After she stopped working for her husband, Ms. McHugh worked part-time as a real estate salesperson with a broker. Between 2000 and 2005, Ms. McHugh sold two properties, but she sold no properties in the two years prior to the trial.
[5] Due to the acrimonious litigation, the child's relationship with his father suffered, and he was left ill, "extremely confused," and in therapy.
[6] I agree with the majority that an independent guardian should have been involved; however, this does not discount the correctness of the trial judge's determination.
[7] In contrast, the majority states two pages later that the former husband is required to pay "for the goods and services needed by his son." If that is the case, why did the majority feel the need to reverse the trial court's formula, which was meant to provide "ample support to pay for [the child's] needs and many of his wants"?
[8] In contrast, three pages earlier, without looking at his income, the majority decides that "no substantial change in circumstances was demonstrated to support modification" of the child support obligation.